REQUESTED BY: Mary Jane Egr State Tax Commissioner
You have requested our opinion as to the effect of recent amendments to the Ethanol Development Act on the current ethanol production credit program. Specifically, you ask when eligibility to participate in the 7.5 cent/gallon incentive program enacted by LB 605 (Neb. Laws 1999) ends in light of amendments to the Act adopted in LB 536 (Neb. Laws 2001).
Section 2(4) of LB 536 amended Neb. Rev. Stat. § 66-1344 by adding the following language:
 (4)(a) Beginning January 1, 2002, any new ethanol facility which is in production at the minimum rate of one hundred thousand gallons annually for the production of ethanol, before denaturing, on or before June 30, 2004, shall receive a credit of eighteen cents per gallon of ethanol produced for ninety-six consecutive months beginning with the first calendar month for which it is eligible to receive such credit and ending not later than June 30, 2012, if the facility is defined by subdivision (b)(i) of this subsection, and for forty-eight consecutive months beginning with the first calendar month for which it is eligible to receive such credit and ending not later than June 30, 2008, if the facility is defined by subdivision (b) (ii) of this subsection.
 (b) For purposes of this section, a new ethanol facility means an ethanol facility which (i) is not in production on or before the effective date of this act or (ii) has not received credits prior to June 1, 1999.
LB 536 also amended Neb. Rev. Stat. § 66-1344(3) as follows:
 (3) Beginning June 1, 2000, during such period as funds remain in the Ethanol Production Incentive Cash Fund, any ethanol facility shall receive a credit of seven and one-half cents per gallon of ethanol, before denaturing, for new production for a period not to exceed thirty-six consecutive months. For purposes of this subsection, new production means production which results from a new facility, a facility which has not received credits prior to June 1, 1999, or
the expansion of an existing facility's capacity by at least two million gallons first placed into service after June 1, 1999, as certified by the facility's design engineer to the Department of Revenue.
Thus, LB 536 deleted the provision in § 66-1344(3) defining "new production" as including production from "a new facility, [and] a facility which has not received credits prior to June 1, 1999." The net effect of these amendments was to create a new production incentive program for ethanol facilities that had not received production credits prior to June 1, 1999, and to end an existing program for such facilities.
Pursuant to LB 536 the new program is to become operational "Beginning on January 1, 2002." However, no date is specified for the termination of the old program. The issue, therefore, is whether the old program terminates three months following the end of the 2001 legislative session (the effective date of the new legislation) or upon commencement of the new program in 2002.
There is no question as to when LB 536 takes effect as a law. Pursuant to Neb. Const. art. III, § 27, "No act shall take effect until three calendar months after the adjournment of the session at which it passed, unless in case of emergency, which is expressed in the preamble or body of the act, the Legislature shall by a vote of two-thirds of all the members elected otherwise direct." Since no declaration of an emergency is contained in the preamble to LB 536, it becomes effective three months after the session (on or about September 1, 2001).
However, the effective date of legislation is not necessarily the same as its operational date. In Wilson v. Marsh, 162 Neb. 237,75 N.W.2d 723 (1956), the court stated:
The prohibition of the Constitution that no act shall take effect until 3 calendar months after the adjournment of the session at which it was passed unless the emergency provisions thereof are complied with is mandatory. This, however, does not deprive the Legislature of the authority to provide that the operation of an act shall be postponed to a time much beyond 3 calendar months after the adjournment of the session at which the act was passed. The fact that ordinarily legislation cannot become law until 3 months after the end of the session at which it was enacted does not mean that it must in all cases be operative immediately upon the expiration of the 3-month period after adjournment of the session.
It has been recognized in this jurisdiction that an act without an emergency provision may become law 3 calendar months after the end of the session at which it was adopted and that the operation of its provisions may be postponed to a much later time designated by a specific date or by the happening of an event that is certain to occur.
Id. at 261.
After discussing past instances where operation of a law had been postponed until a time or event expressly designated in the law itself, the court proceeded to consider whether the operative date of a law could be postponed based on legislative intent. The court stated, "It is indispensable to a decision of this case to determine when the Legislature intended that the Judges Retirement Act should be operative."Id. at 263. In this regard, the court found "the legislative intent may be gathered from the reason for the enactment of the legislation in question." Id. at 264. The court then construed the statute to have an implied operative date of January 3, 1957 (rather than September 18, 1955). "This interpretation has the same effect as if the Legislature had in the act expressly declared that it should not go into operation until the beginning of the new term or as soon as it could constitutionally do so." Id. at 265. Thus, the court looked to legislative intent to determine the operative date of the statute even though no date or event was specified in the law.
The relevant inquiry, then, is whether the Legislature intended the existing ethanol incentive program to terminate on a date other than the effective date of LB 536. Stated differently, did the Legislature intend for there to be a four month lapse in the existing ethanol incentive program, or was it intended that the existing program would operate until the new program begins?
As is clear from Wilson v. Marsh, legislative intent to set an operational date other than on the first constitutionally permitted effective date for legislation need not be expressly set forth in the bill, but can be ascertained from the legislative purpose behind the bill where an ambiguity exists. Id. at 737-738.
In this case, the legislative history of LB 536 evidences a legislative intent that the new ethanol incentive program modify and extend the existing program. No evidence exists that a four month gap in the incentive program was intended. The following statements from the legislative history support this conclusion:
 1. "Section 66-1330 is further amended to extend
and modify the existing seven and a half cent production credit established with the enactment of LB 605 in 1999." Committee Records on LB 536, 97th Legis., 1st Sess. 35 (Neb. 2001) (Statement of Sen. Dierks).
 2. "As the bill was introduced it would have proposed to extend the 7.5 cent per gallon incentive to five years. The committee amendments reduce the period in which the 7.5 cent per gallon incentive could be obtained from that proposed five years to three years." Floor Debate on LB 536, 97th Legis., 1st Sess. 5408 (Neb. 2001) (Statement of Sen. Wickersham).
 3. "I wanted us to go into this discussion this morning understanding that LB 536 is an extension of a current program. Floor Debate on LB 536, 97th Legis., 1st Sess. 5413 (Neb. 2001) (Statement of Sen. Baker).
 4. " is important that we continue to have Sutherland operating out there. It is providing a market and a number of jobs." Floor Debate on LB 536, 97th Legis., 1st Sess. 5425 (Neb. 2001) (Statement of Sen. Baker).
We also note that the Legislative Fiscal Analyst Estimate (Fiscal Note) for LB 536 shows estimated EPIC Fund expenditures for 2001 to be $750,000 for the Sutherland plant under the old program. This is the maximum annual incentive payment permitted by law to an eligible plant and supports the conclusion the plant was expected to remain eligible for the program beyond September 1, 2001.
 Conclusion
In light of the apparent legislative intent to extend and modify the existing ethanol production incentive program it is our opinion the 7.5 cent/gallon program does not end until commencement of the new program on January 1, 2002.
 Sincerely, DON STENBERG Attorney General
 Steve Grasz Deputy Attorney General